# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS – TEXARKANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* HUGH J. WARD III, and on behalf of the STATES of HAWAII, INDIANA, MARYLAND, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, RHODE ISLAND, Commonwealth of VIRGINIA, and VERMONT | Civil Action No. 5:20-CV-00180 |
| *Plaintiffs.* | *SEALED* |
| v. | COMPLAINT |
| HUDSON ADVISORS, LLC, HUDSON ADVISORS L.P., HUDSON ADVISORS ASSOCIATES, L.P., HUDSON ADVISORS INSURANCE AGENCY, LLC, LONE STAR GLOBAL ACQUISITIONS, LONE STAR R.E. MANAGEMENT CO., LTD., LONE STAR R.E. MANAGEMENT CO. II, LTD., LONE STAR R.E. MANAGEMENT CO., III, LTD., LONE STAR R.E. MANAGEMENT CO. IV, LTD., LONE STAR R.E. MANAGEMENT CO. V, LTD., LONE STAR MANAGEMENT CO. V, LTD., LONE STAR MANAGEMENT CO., VI, LTD., LONE STAR MANAGEMENT CO., VII, LTD., LONE STAR MANAGEMENT CO., VIII, LTD., LONE STAR MANAGEMENT CO., IX, LTD., LONE STAR MANAGEMENT CO., X, LTD., LONE STAR MANAGEMENT CO., XI, LTD., LONE STAR RESIDENTIAL MORTGAGE MANAGEMENT CO., I, LTD., LONE STAR RESIDENTIAL MORTGAGE MANAGEMENT CO., II, LTD., LONE STAR REAL ESTATE PARTMERS, L.P., LONE STAR REAL ESTATE PARTNERS II, L.P., LONE STAR REAL ESTATE PARTNERS III, L.P., LONE STAR REAL ESTATE PARTNERS IV, L.P., LONE STAR REAL ESTATE PARTNERS V, L.P., LONE STAR REAL ESTATE PARTNERS, VI, L.P., LONE STAR PARTNERS V, L.P., LONE STAR PARTNERS VI, L.P., LONE STAR PARTNERS VII, L.P., LONE STAR | JURY TRIAL DEMANDED |

PARTNERS VIII, L.P., LONE STAR
PARTNERS IX, L.P., LONE STAR
PARTNERS X, L.P., LONE STAR
PARTNERS XI, L.P., LONE STAR
RESIDENTIAL MORTGAGE PARTNERS I,
L.P., LONE STAR RESIDENTIAL
MORTGAGE PARTNERS II, L.P., LONE
STAR GLOBAL ACQUISITIONS, LLC d/b/a
LSGA, LLC, LONE STAR GLOBAL
ACQUISITIONS (NY), LLC d/b/a LSGA
(NY), LLC,  JOHN P. GRAYKEN; and DOES
1-100,

*Defendants*.

This is an action brought on behalf of the United States of America by Hugh J. Ward III ("Relator" or "Ward"), by and through his attorneys, against Defendants, pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3279 *et seq*. and pursuant to the following State *qui tam* statutes: the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq*.; the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq*.; the Maryland False Claims Act, Md. Gen. Provis. § 8-101 *et seq*; the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq*.; the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1, *et seq*.; the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq*.; the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq*.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq*.; and the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq*. ("State *qui tam* statutes" or "*Qui Tam* States").

## STATEMENT OF THE CASE

1.     This is an action to recover damages and civil penalties on behalf of the United States and the *Qui Tam* States, arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by Defendants and/or their agents, employees and co-conspirators under the False Claims Act and the State *qui tam* statutes.

2.     The United States and the *Qui Tam* States—through various government retirement systems established for retired employees of the United States and the *Qui Tam* States, as well as several State public universities—invested more than **$1.8 billion** in the various Lone Star Funds. Lone Star represented to its investors that the fees charged to the funds were below market and covenanted to charge commercially reasonable fees and no more than would be charged in an arm's length transaction.

3.     Hudson Advisors, a Lone Star affiliate owned entirely by the Chairman of Lone Star, provided asset management and loan-servicing to the Lone Star Funds. While the Lone Star Funds produced consistently positive returns for their investors, Hudson secretly increased its fees astronomically. For example, during 2017, Hudson's fees for Lone Star's North American real estate investments varied from fees charged by Hudson's third-party competitors in a range from **291%** above market rates at the low end to **4040%** above market rates at the high end. Lone Star buried these increases in the financial reporting so it could not be detected. And, at the same time as investors' returns were nose-diving, Hudson's internal presentations showed what would happen if fees were doubled, tripled, quadrupled, all the way up to octupled (8X) beyond competitive rates:

| Lighthouse Fee Analysis (Underwriting Perspective) ($) in millions | AM Fees (% of APP) | Multiple of Base Fees | Returns Summary | | | | Total Profit | Projected AM Fees | | | | | Total Corp Services | Total Fees | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case | | | IRR | CRM | $m | Δ vs. Base | | Year 1 | Year 2 | Year 3 | Year 4 | Total AM | | AM + Corp | Δ vs. Base |
| Base Underwritten Scenario | 0.16% | N/A | 25.0% | 1.99x | $1,095.3 | | | $ 10.5 | $ 8.9 | $ 8.9 | $ 8.7 | $ 37.0 | 13.3 | $ 50.3 | N/A |
| Alternate Scenario 1 | 0.32% | 2.0x | 24.0% | 1.95x | 1,058.3 | (37.0) | | 20.9 | 17.9 | 17.9 | 17.3 | 74.0 | 13.3 | 87.3 | 37.0 |
| Alternate Scenario 2 | 0.48% | 3.0x | 23.0% | 1.91x | 1,021.2 | (74.1) | | 31.4 | 26.8 | 26.8 | 26.0 | 111.0 | 13.3 | 124.3 | 74.0 |
| Alternate Scenario 3 | 0.64% | 4.0x | 22.0% | 1.88x | 984.2 | (111.1) | | 41.9 | 35.8 | 35.8 | 34.6 | 148.0 | 13.3 | 161.3 | 111.0 |
| Alternate Scenario 4 | 0.80% | 5.0x | 21.0% | 1.84x | 947.2 | (148.1) | | 52.4 | 44.7 | 44.7 | 43.3 | 185.0 | 13.3 | 198.3 | 148.0 |
| Alternate Scenario 5 | 0.96% | 6.0x | 20.0% | 1.80x | 910.2 | (185.1) | | 62.8 | 53.7 | 53.7 | 51.9 | 222.0 | 13.3 | 235.3 | 185.0 |
| Alternate Scenario 6 | 1.12% | 7.0x | 19.0% | 1.76x | 873.1 | (222.2) | | 73.3 | 62.6 | 62.6 | 60.6 | 259.0 | 13.3 | 272.3 | 222.0 |
| Alternate Scenario 7 | 1.28% | 8.0x | 18.1% | 1.72x | 836.1 | (259.2) | | 83.8 | 71.5 | 71.5 | 69.2 | 296.1 | 13.3 | 309.4 | 259.0 |
| Alternate Scenario (18% IRR) | 1.30% | 8.1x | 18.0% | 1.71x | $ 832.1 | $ (263.2) | | $ 84.9 | $ 72.5 | $ 72.5 | $ 70.1 | $ 300.1 | $ 13.3 | $ 313.4 | $ 263.1 |

4.    As a result of this scheme, the United States and the *Qui Tam* States have been harmed by increased fees and reduced returns over the various Lone Star Funds by at least **$60,000,000** in the funds for which Relator has personal knowledge.[1]

5.    Relator Ward uncovered this scheme as a high-ranking employee of Lone Star. Ward ran Lone Star's North American commercial real estate investment operations when he uncovered evidence of this scheme. He was trying to understand the reduced returns of some of the assets in his funds and after investigation realized that the reduced returns were due entirely to the increased fees from Hudson (though the funds had matured and actually required less work by Hudson). Ward relentlessly pursued the matter internally and advanced his findings to his superiors. Ward planned to disclose the astronomical Hudson fees to the investors and explain how those fees had significantly reduced their returns, but just days before the quarterly investor meeting, he was summarily terminated by Lone Star to avoid Ward disclosing the Hudson fees and their effects on returns to the investors, including the United States and the *Qui Tam* States.

6.    Ward is the original source for the information underlying this matter

---

[1] Upon information and belief, Hudson also overcharged fees and reduced returns in amounts collectively exceeding many hundreds of millions or billions of dollars across all the Lone Star Funds in which the United States and the *Qui Tam* States have invested over the years. While the Relator has personal knowledge of the excessive fees charged from 2016-18, the Hudson-Lone Star fee arrangement has been in place since 1995.

and for investigations of this matter in other jurisdictions.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345. The Court has original jurisdiction of the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

8.    This Court has personal jurisdiction over each of the Defendants. Defendants' presence in the State of Texas has been so continuous and systematic that they are "at home" in Texas. Many of the Defendants herein are entities formed under Texas law. On information and belief, Texas is the principal place of business of all entity Defendants sued herein. Defendants have purposefully directed their unlawful business activities, including the scheme underlying the claims herein, at the State of Texas. Defendants have solicited investors in Texas using the misrepresentations described herein. Defendants have executed the fee-overcharge scheme described herein primarily through agents and employees based in Texas.   Representatives of the Teachers Retirement System of Texas sit on the Advisory Committees of several of the Lone Star funds that have been subjected to the false claims and inflated requests for fees described herein.

9.    Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because at least one defendant "can be found" in this judicial district.

## PARTIES

10.    Relator Hugh J. Ward, III, is an individual residing in Rumson, New Jersey. Relator Ward is the original source of the allegations in this Complaint, and these allegations are not based upon publicly-disclosed information. Also prior to the filing of this action, Relator Ward brought the wrongdoing described herein to the attention of the Defendants, and was terminated as a result of his efforts to expose the scheme set forth herein. Relator Ward has direct and independent knowledge of the allegations and transactions herein.

11.    Defendant Hudson Advisors L.L.C. is a Texas limited liability company, with principal place of business in Dallas, Texas. On information and belief, Lone Star's Chairman, John P. Grayken, owns 100 percent of the membership interests in Hudson Advisors.

12.    Defendant Hudson Advisors L.P. is a Delaware limited partnership, with principal place of business in Dallas, Texas. Hudson Advisors L.P. is a wholly owned subsidiary of Hudson Advisors L.L.C.

13.    Defendant Hudson Advisors Associates L.P. is a Texas limited partnership, with principal place of business in Dallas, Texas.

14.    Defendant Hudson Advisors Insurance Agency L.L.C. is a limited liability company formed in Delaware, with principal place of business in Dallas, Texas.

15.    Lone Star Global Acquisitions, Ltd., doing business as LS Global Acquisitions Limited, is a company formed under the laws of Bermuda. Its principal place of business is in Dallas, Texas.

16.    Defendant Lone Star R.E. Management Co., Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of

business in Dallas, Texas.

17.    Defendant Lone Star R.E. Management Co. II, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

18.    Defendant Lone Star R.E. Management Co. III, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

19.    Defendant Lone Star R.E. Management Co. IV, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

20.    Defendant Lone Star R.E. Management Co. V, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

21.    Defendant Lone Star Management Co. V, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

22.    Defendant Lone Star Management Co. VI, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

23.    Defendant Lone Star Management Co. VII, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

24.    Defendant Lone Star Management Co. VIII, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of

business in Dallas, Texas.

25.    Defendant Lone Star Management Co. IX, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

26.    Defendant Lone Star Management Co. X, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

27.    Defendant Lone Star Management Co. XI, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

28.    Defendant Lone Star Residential Mortgage Management Co. I, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

29.    Defendant Lone Star Residential Mortgage Management Co. II, Ltd., is a Bermuda exempted company which, on information and belief, maintains a principal place of business in Dallas, Texas.

30.    Defendant Lone Star Real Estate Partners, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

31.    Defendant Lone Star Real Estate Partners II, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

32.    Defendant Lone Star Real Estate Partners III, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

33.    Defendant Lone Star Real Estate Partners IV, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

34.     Defendant Lone Star Real Estate Partners V, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

35.     Defendant Lone Star Real Estate Partners VI, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

36.     Defendant Lone Star Partners V, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

37.     Defendant Lone Star Partners VI, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

38.     Defendant Lone Star Partners VII, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

39.     Defendant Lone Star Partners VIII, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

40.     Defendant Lone Star Partners IX, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

41.     Defendant Lone Star Partners X, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

42.     Defendant Lone Star Partners XI, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

43.     Defendant Lone Star Residential Mortgage Partners I, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

44.     Defendant Lone Star Residential Mortgage Partners II, L.P., is a Bermuda limited partnership that maintains a principal place of business in Dallas, Texas.

45.    Lone Star Global Acquisitions, L.L.C., doing business as LSGA, L.L.C. is a limited liability company formed under the laws of Delaware, with principal place of business in Dallas, Texas.

46.    Lone Star Global Acquisitions (NY), L.L.C., doing business as LSGA (NY), L.L.C. is a limited liability company formed under the laws of Delaware, with principal place of business in Dallas, Texas.

47.    Defendant John P. Grayken, III, is an individual who, on information and belief, maintains a place of residence at 1 Franklin Street, 60th Floor, Boston, Massachusetts 02110. Grayken is a multi-billionaire. He renounced his United States citizenship in 1999 in favor of Ireland to avoid paying income-tax back to the United States. On information and belief, since 1999 Grayken's residences have included the Isle of Skye, the Bahamas, London, and a ship in international waters.

48.    Relator does not know the true names and capacities of Defendants sued herein as Does 1-100, inclusive, and therefore sues these Defendants by such fictitious names. Relator will amend this complaint to allege the true names and capacities of these Defendants when ascertained. Relator is informed and believes that each of the fictitiously named Defendants is legally liable as alleged herein.

49.    The Defendants listed above are referred to collectively herein as "Defendants."

50.    The Defendants that are entities are referred to collectively herein as the "Entity Defendants."

51.    At all times alleged herein, Grayken has been an agent, partner, joint-venturer, associate, employee, owner, and/or co-conspirator of one or more of the Entity Defendants, and was acting in the course and scope of such agency, partnership, joint

venture, association, employment, and/or conspiracy when the acts or omissions giving rise to the causes of action occurred.

52.     On information and belief, and as more fully set forth below, each of the Entity Defendants are now, and were at all relevant times, Defendant Grayken's alter-egos:

a.   As between Grayken and the Entity Defendants there exists such unity of ownership and interest that any separateness has ceased to exist. Grayken has usurped the assets of the Entity Defendants for his personal use, caused assets of the Entity Defendants to be transferred to his personal accounts without adequate consideration, has executed a purported fee-arrangement between various Entity Defendants in order to fund his personal liquidity-needs and, in furtherance thereof, has withdrawn funds from the Entity Defendants for his personal use.

b.   Grayken exerts complete control and domination of the Entity Defendants and unilaterally causes transactions to be carried out between one and another of the Entity Defendants: (i) without holding Directors or Shareholders meetings, (ii) without maintaining records or minutes of any corporate proceedings, and (iii) without any independent oversight or approval of disinterested directors, partners, owners and/or members.

c.   Adherence to the fiction of any separate existence between Grayken and the Entity Defendants, as entities distinct from Grayken, would permit abuse of the corporate privilege and would sanction fraud

and other criminal misconduct.

53.     As a result of the acts and omissions set forth herein immediately above, and as further set forth in the paragraphs that follow, each one of the Defendants is jointly and severally liable for all relief sought herein against all Defendants.

## DEFENDANTS SCHEME TO DEFRAUD THE UNITED STATES AND THE *QUI TAM* STATES

### A. Lone Star and Hudson.

54.     Lone Star is one of the best known and most successful private-equity organizations in the world since its integration in 1995. Its portfolio has leveraged in excess of $85 billion dollars collected from investors into $100's of billions of dollars of assets on its books. Lone Star specializes in buying distressed real estate assets, among other investments in real estate, equity, credit and other financial assets. Substantially all of Lone Star's capital has come from "accredited" and institutional investors, including sovereign governments and their political subdivisions, corporate pension funds, charitable trusts, hospitals and universities, among many others.

55.     On information and belief, Lone Star is organized as follows. Grayken controls Lone Star's general operations through one or more entities operating under the title "Lone Star Global Acquisitions" (in various formations). For each major group of investments that Lone Star pursues, a separate and distinct "fund" is created. Each fund is comprised of two distinct limited partnerships. One limited partnership is a Delaware limited partnership into which United States investors commit funds and acquire limited partner interests. The other limited partnership is a Bermuda limited partnership into which non-U.S. investors commit funds and acquire limited partner interests. Twenty pairs of such funds have been created since 1995 (*i.e.*, twenty Delaware limited

partnerships and twenty Bermuda limited partnerships).

56.    To avoid federal public-offering requirements, Lone Star solicits capital from "accredited" and institutional investors, who invest by acquiring limited partnership interests in one or more of Lone Star's limited partnerships.

57.    The general partner of each "fund' limited partnership is itself a Bermuda limited partnership. The limited partners of that Bermuda limited partnership are Lone Star managers (such as Relator) who often commit their own personal capital into the funds. In each case, the general partner of the Bermuda limited partnership that serves as general partner to the funds is itself a Bermuda exempted entity wholly owned and controlled by Grayken.

58.    On information and belief, the Entity Defendants include all of the Bermuda limited partnerships that presently serve as general partners in Lone Star's U.S. and Bermuda funds and include all of Grayken's Bermuda exempted companies that serve as general partners to those Bermuda limited partnerships.

59.    Grayken thus maintains sole and exclusive control of the general partners of every Lone Star limited partnership.

60.    Lone Star's commercial real estate funds are named, *e.g.*, "Lone Star *Real Estate* Fund IV." There have been six such "Real Estate" funds created since 1995. Lone Star has also created eleven other funds since 1995 with investments in residential real estate, real-estate-related loans, securities and private equity, as opposed to investments in commercial real-estate. Such funds are internally code-named "Opportunity" funds. The names of the limited partnerships created for the "Opportunity" funds follow the form of, *e.g.*, "Lone Star Fund X." The Opportunity funds have been larger, were formed more frequently and have had even more committed capital than the

commercial real estate funds. Lone Star has also created two "Residential Mortgage" funds.

61.    At or around the same time as Grayken founded Lone Star as an investment vehicle, Grayken also founded Defendant Hudson Advisors LLC ("Hudson") (Hudson's predecessor operated under the name "Brazos Advisors") to carry out the day-to-day management and servicing of the assets held by Lone Star. Grayken has always maintained sole and exclusive control and ownership of Hudson.

62.    Until the beginning of 2018, and since 1995, Lone Star was Hudson's only client. At all times since Lone Star's inception in 1995 through the present, Lone Star has employed Hudson (which includes its predecessor(s) in interest) to provide financing and asset-management services to Lone Star's limited partnerships.

63.    On December 5, 2017, at an annual New York investor conference, Grayken announced that Hudson would for the first time start performing work for third parties. Grayken assured Lone Star investors that this would result in even greater scale and market scrutiny, resulting in increased discipline and cost savings to Lone Star investors.

64.    Unlike Lone Star's key competitors such as Blackstone, which are transparent to the public and provide extensive backup for affiliate transactions, particularly those involving asset management fees, Lone Star avoids public scrutiny by maintaining an opaque internal structure and by limiting disclosures to investors.

65.    Lone Star and Hudson employ numerous managers and professionals to acquire and manage assets on behalf of investors, but only Grayken's trusted confidants are privy to the true nature of, and relationship between, Lone Star and Hudson Advisors. Those trusted confidants are Lone Star's President of North America

and Latin America, André Collin; Lone Star's Global President and Chief Legal Officer, William Young; and Hudson's President (and Grayken's brother-in-law) Nicholas Beevers. Others who have faithfully executed Grayken's unlawful directives include Jodi Cason (Hudson's Chief Operating Officer), Lone Star Senior Managing Director of Portfolio Management and Operations, Danick Tremblay and, until he was recently terminated, Brian Collyer, the former President of North America and Latin America for Lone Star.

66.    On information and belief, Grayken is in fact the sole controller of the Lone Star organization through his exclusive ownership and/or domination of the Lone Star Global Acquisitions entities and exclusive ownership and/or domination of the general partners in each of Lone Star's numerous limited partnerships. Grayken is also the sole controller of the Hudson organization.

67.    What follows is a diagram of the Hudson-Lone Star organization, set forth herein on information and belief:



68.     Grayken being in full control of both Lone Star and Hudson creates a clear conflict of interest. To assuage investor concerns, Lone Star assures investors, including the United States and *Qui Tam* States, that Lone Star's relationship with Hudson is beneficial to investors as compared with a disinterested third party. Indeed, in substantially all of the promotional materials, pamphlets and presentations delivered to investors and potential investors over the years, Lone Star's exclusive arrangement with Hudson has been touted as beneficial to investors in several ways, including: (a) that "Hudson's management fee structure is approved in advance by the limited partners within the limited partnership agreement of each fund;" (b) that Hudson's "asset management costs are **consistently and significantly lower than comparable third party servicers**;" and (c) that the "alignment of interests" between Lone Star and Hudson is an advantage that "is difficult to achieve on a 3rd party basis where the manager seeks rich, long dated fee streams." Indeed, before investing $15,000,000.00 in Lone Star Real Estate Fund II (U.S.), L.P., the Los Angeles Department of Water and Power received a pamphlet containing the foregoing language, which is annexed hereto as **Exhibit 1**. On information and belief, representatives of the United States (specifically, representatives of the Railroad Retirement Board) and Representatives of the *Qui Tam* States received similar materials prior to investing in Lone Star's funds.

69.     In dozens of fundraising presentations that Relator personally attended, Hudson was touted time and again as Lone Star's "secret weapon."

70.     To continue the appearance of neutrality between Lone Star and Hudson despite their common ownership, the limited partnership agreements for the Lone Star funds include provisions stating that Hudson Advisors will be dealt with as a disinterested third-party. For instance, Section 2.04 of the Third Amended and Restated

Limited Partnership Agreement of Lone Star Real Estate Fund II (U.S.), L.P. (the "LSREF II (U.S.) Partnership Agreement," a draft of which is annexed hereto as **Exhibit 2**), provides in relevant part as follows:

> Section 2.04.  Affiliates.  The General Partner shall have the right to cause the Partnership to enter into contracts or otherwise deal with any Affiliates of the General Partner, any Principal or the Lone Star Funds in any capacity, including, without limitation, the acquisition and purchase of assets and in connection with the financing, management, and development of the Partnership Assets, **except that the terms of any such arrangement shall be no less than commercially reasonable and competitive with amounts that would be paid to third parties on an "arms-length" basis and must also be approved by the Advisory Committee**; provided that, any such arrangements between the General Partner and any of its Affiliates that are provided at no additional cost to the Partnership do not require Advisor Committee approval. The Partners acknowledge that the General Partner shall have the right to cause the Partnership or one or more Affiliates of the Partnership to enter into agreements with Hudson Advisors LLC ( an Affiliate of certain of the Principals) and certain subsidiaries of Hudson Advisors LLC ( collectively, ***"Hudson") ....***

71.    In some Lone Star limited partnership agreements (though it is unknown to Relator how many) there is a "Hudson Fee Schedule" that, among other things, confirms that "the basis for determining the maximum asset management fee is based on the aggregate net book value of the assets." In the limited partnership agreements where such Fee Schedule is present, Hudson's fees cannot exceed certain pre-defined maximums (even if market conditions would have supported higher rates). One example of such a Hudson Fee Schedule is Exhibit E to the LSREF II (U.S.) Partnership Agreement. Other Lone Star limited partnership agreements do not contain such a schedule.

72.    The "management fee structure" that is "approved in advance by the limited partners within the limited partnership agreement of each fund" therefore has at least five parameters: (a) Hudson's fees are a percentage of the "net aggregate book value of the assets" under Lone Star's management; (b) Hudson's fees must be "commercially

reasonable;" (c) Hudson's fees must be competitive with the fees charged by comparable third parties; (d) Lone Star and Hudson must deal with each other at arms' length; and (e) in some cases, Hudson's fees cannot exceed certain maximums (even if comparable third parties are charging above those rates).

73.    As more fully set forth below, Relator Ward—the former Co-Head of Lone Star's North American Commercial Real Estate investment operations—discovered that Lone Star's representations and commitments regarding Hudson could not be further from the truth. Because Hudson's fees are based on the "aggregate book value" of the assets under Lone Star's management (a value that likely has exceeded 300 billion dollars over the twenty-five year existence of Lone Star), Hudson has generated billions of dollars by manipulating the basis points of the fees Hudson overcharged Lone Star and its investors, such as the United States and the *Qui Tam* States.

### B. The United States and the *Qui Tam* States have invested over $1.3 billion in Lone Star's limited partnerships.

74.    As set forth in the paragraphs that follow, the United States and the *Qui Tam* States are investors and limited partners in several of Lone Star's limited partnerships. Relator only has available records of ownership for six of the numerous Lone Star limited partnerships that exist or that have existed since Lone Star's inception in 1995. Relator has also examined publicly available information and, based on that information, it is known that the United States and the *Qui Tam* States have invested in numerous other Lone Star funds over that timeframe.

75.    Based on the records of ownership presently in Relator's possession and publicly available records, Relator is informed and believes that the United States, through the National Railroad Retirement Investment Trust has invested at least

$100,000,000 in Lone Star Real Estate Fund II (U.S.), L.P. ("LSREF II (U.S.)").  The National Railroad Retirement Investment Trust is administered by the Railroad Retirement Board, an independent agency in the executive branch of the federal government.

76.    Based on the records of ownership presently in Relator's possession and publicly available records, Relator is informed and believes that the State of Hawaii, through the Employees' Retirement System of the State of Hawaii and the University of Hawaii Foundation, has invested at least $15,000,000 in LSREF II (U.S.). The State of Hawaii, through the Employees' Retirement System of the State of Hawaii, has invested at least $25,000,000 in Lone Star Fund VII (U.S.), L.P. ("LSF VII (U.S.)"). Thus, it is known to Relator that the State of Hawaii has invested a total of at least $40,000,000 in the Lone Star funds.

77.    Based on the records of ownership presently in Relator's possession and publicly available records, Relator is informed and believes that the State of Indiana, through the Indiana Public Employees Retirement Fund, has invested at least $30,000,000 in LSF VI (U.S.).

78.    Based on the records of ownership presently in Relator's possession and publicly available records, Relator is informed and believes that the State of Maryland, through the Board of Trustees for the Maryland State Retirement and Pension System, has invested $150,000,000 in LSREF II (U.S.), $100,000,000 in Lone Star Real Estate Fund III (U.S.), L.P. ("LSREF III (U.S.)"), $81,000,000 in Lone Star Real Estate Fund IV (U.S.), L.P. ("LSREF IV (U.S.)"), $100,000,000 in  Lone Star Real Estate Fund VI (U.S.), L.P. ("LSREF VI (U.S.)"). The State of Maryland has also invested in Lone Star Real Estate Fund V (U.S.), L.P. ("LSREF V (U.S.)") and Lone Star Fund XI (U.S.), L.P.,

("LSF XI (U.S.)"), however the amounts invested are presently unknown to Relator. Thus, it is known to Relator that the State of Maryland has invested a total of more than $431,000,000 in the Lone Star funds.

79.     Based on the records of ownership presently in Relator's possession and publicly available records, Relator is informed and believes that the State of New Mexico, through the New Mexico Educational Retirement Board, has invested at least $25,000,000 in LSREF II (U.S.), $21,100,000 in LSREF V (U.S.), $50,000,000 in LSREF VI (U.S.), $50,000,000 in LSF VII (U.S.), $50,000,000 in LSF VIII (U.S.), $150,000,000 in LSF X (U.S.), and $50,000,000 in LSF XI (U.S.). Thus, it is known to Relator that the State of New Mexico has invested a total of at least $396,100,000 in the Lone Star funds.

80.     Based on the records of ownership presently in Relator's possession and publicly available records, Relator is informed and believes that the State of New Jersey, through its Common Pension Fund E,  has invested at least $100,000,000 in LSREF II (U.S.) and $300,000,000 in LSF VII (U.S.). Thus, it is known to Relator that the State of New Jersey has invested a total of at least $400,000,000 in the Lone Star funds.

81.     Based on the records of ownership presently in Relator's possession and publicly available records, Relator is informed and believes that the State of North Carolina, through the Treasurer of the State of North Carolina, has invested at least $300,000,000 in LSREF II (U.S.).

82.     Based on the records of ownership presently in Relator's possession and publicly available records, Relator is informed and believes that the State of Rhode Island, through the Employees' Retirement System of the State of Rhode Island,  has invested at least $24,100,000 in LSREF IV (U.S.).

83.     Based on the records of ownership presently in Relator's possession and publicly available records, Relator is informed and believes that the State of Vermont, through the University of Vermont and State Agricultural College, has invested $5,000,000 in LSREF III (U.S.).

84.     Based on the records of ownership presently in Relator's possession and publicly available records, Relator is informed and believes that the Commonwealth of Virginia, through the Virginia Retirement System, has invested at least $150,000,000 in LSREF III (U.S.).

85.     Thus, based only on the specific amounts presently known to Relator, it is known that the United States and the *Qui Tam* States have collectively invested more than **$1,876,200,000** with Lone Star. This amount does not include additional amounts that the United States and the *Qui Tam* States have invested with Lone Star's numerous funds for which Relator does not have ownership records and for which no public information is available. The precise amounts invested will be ascertained in due course.

## C.  **Relator Ward uncovers an enormous fraud perpetrated on the United States and the *Qui Tam* States.**

86.     Relator Ward began working as Senior Vice President & Head of Underwriting for Hudson North America in 2010. Two years after starting at Hudson he was promoted to Lone Star, which allowed him to identify, pursue and oversee investments on behalf of Lone Star. Ward was Lone Star's top performer, and rapidly moved up the ranks to become Co-Head of Lone Star's North American Commercial Real Estate Investments. The other Co-Head was Bob Ricci who is still with Lone Star.

87.     As Co-Head of North American Commercial Real Estate Investments,

Ward was responsible for Lone Star's entire North American portfolio of commercial real estate investments, which at one point included $21 billion under management. Among the investments under Ward's supervision were the very investments that the United States and the *Qui Tam* States invested hundreds of millions of dollars into.

88.    Ward's job was to diligently pursue investment opportunities on behalf of Lone Star's investors and ensure they received maximal returns. Ward himself was (and remains) invested in the Lone Star funds he oversaw and thus he was personally exposed to the same opportunities, pitfalls and, sadly, schemes as other Lone Star investors.

89.    To achieve maximal returns, Ward had at his disposal many tools: identifying attractively priced assets to acquire, designing and obtaining creative financing arrangements, thoroughly underwriting acquisitions, creating meticulous business plans and ensuring that those plans were executed without delay and according to budget, managing operating costs, and having no tolerance for large variances or unpleasant surprises. However, one factor affecting investment returns remained uncontrollable even to Lone Star managers at Ward's level of seniority: the fees that Hudson would charge Lone Star, and Lone Star's payment of those fees to Hudson.

90.    As to what drove those fees, everyone outside Grayken's inner circle (including Ward and the investors/limited partners) relied on Lone Star's promises in the limited partnership agreements that "the terms of [the] arrangement [between Lone Star and Hudson] shall be commercially reasonable and competitive with amounts that would be paid to third parties on an 'arms-length basis,'" and further relied on the repeated representations that Lone Star made regarding Hudson's "large scale and cost control," "alignment of interests" with Lone Star's, and fees that were "consistently and

significantly lower than comparable third-party servicers."

91.    Ward's investigation, which uncovers the true nature of the Hudson-Lone Star fee arrangement, began in early January 2018. At the time, Ward was responsible for the largest investment in Lone Star's history, internally code-named "Lighthouse." The investment involved buying a publicly traded Real-Estate Investment Trust (REIT) for over $8 billion, taking it private, improving the properties in the REIT, reducing inefficiencies, and ultimately selling it off. Investors in the United States and abroad had committed over a billion dollars to the Lighthouse project. The funds committed to the LSREF IV (U.S.) limited partnership (and a Bermuda counterpart created for international investors) were used to fund the Lighthouse investment.

92.    Ward first became suspicious of the Hudson fees on January 4, 2018. As per the normal protocol, Ward would periodically receive notice of what Hudson's fees were, retroactively over a certain period of time. Ward's team would incorporate the fee number as one of hundreds of parameters comprising the expenses for a particular investment.

93.    On January 4, 2018, Ward received notice that the Hudson fee for the Lighthouse investment he oversaw would be 44 basis points ("BPS") starting retroactively from October 2017. This number was more than double the historical average and approximately three times the amount that had been approved when the investment was underwritten. Indeed, Lone Star's "Investment Committee" had approved the Lighthouse investment on the assumption of only 16 BPS in fees.

94.    Upon receiving this notice, Ward immediately wrote an email to Hudson Chief Operating Officer, Jodie Cason (after first attempting to call her), with subject line: "Outrageous Hudson Fees Charged to Lighthouse." Among other things,

Ward stated "as usual there is no back-up/substantiation" for the fees. He ended the email saying that they "[n]eed to get to the bottom of this with the right group of people because this is not acceptable."

95.    Cason responded to Ward on January 4, 2018, stating "Yes, the Hudson fees increased effective Oct 1, 2017. This was approved by the Hudson board and André [Collin] and all Region Heads were also made aware of the increase prior to its effective date" and offered to discuss the matter further in person.

96.    Ward then responded to Cason (in full) as follows:

Thanks for quick reply. But again this is completely nuts. The rates were already raised from 2016 to 2017 .....as I mentioned, our Lighthouse [Asset Management] fee went from 18 bps in 2016 to 22 bps in 2017 but that was already ALL due to an increase in rates....our hours billed to Lighthouse in 2017 actually went DOWN 15% from 2016! This is completely nuts. So after a huge increase already in 2017 we want to do more than double Hudson fees again? Nuts. We already have the highest IRR hurdle by 800 bps, are the only Fund to calculate IRR post Tax and now our AM fees are thru the roof? I am out of country next week but can do a call Monday at your convenience thanks

97.    Undeterred by the evasive responses he was receiving, Ward began his investigation in earnest. Ward and his team surveyed representatives of four investment businesses of comparable size and sophistication to Lone Star: Blackstone, Brookfield Asset Management, Starwood Capital Group and Garrison Investment Group. Each investment group had essentially the same cost for asset management: 22 BPS for Blackstone; 25 BPS for Starwood; 25 BPS for Brookfield; and 21 BPS for Garrison. More broadly, their representatives agreed that the market rate for these services was between 15 and 25 BPS. The representatives for each of the foregoing investment groups were stunned when they heard that Hudson was charging 44 BPS on the Lighthouse investment; one group laughed out loud.

98.    Soon thereafter, Hudson's fees charged to the Lighthouse investment nearly doubled in size again, climbing to 73 BPS.

99.    By January 15, 2018, Ward's team had constructed a chart showing the fees that Hudson was charging with respect to several of the largest North American investments in Lone Star's portfolio. The numbers were staggering for 2016 and were increasing exponentially. For instance, for an investment code-named "Skyline," the fees in 2016 had been 114 basis points, had risen to 147 BPS and were projected to be 281 BPS in 2018. The same pattern was occurring for each investment Ward's team investigated.

100.    Ward's chart also showed how much was being charged by Blackstone, Starwood and Garrison, and the variance between the numbers. Incredibly, the variance between the fees charged by Hudson and third-party competitors ranged from **<u>291%</u>** higher than the competition on the low end to **<u>4040%</u>** higher than the competition on the high end.

101.    On January 15, 2018, Ward emailed the chart along with an email with subject-line "Hudson AM Fee Analysis" to his direct supervisor, and then-Lone Star President of North and Latin America, Brian Collyer. That email, including the chart attached thereto, is annexed hereto as **<u>Exhibit 3</u>**.

102.    Ward expressed his grave concern to Collin for the investors to whom he would need to explain the staggering fees. Multiple communications were exchanged over the subsequent weeks in Ward's attempt to get to the bottom of the unfathomable numbers. When Ward's direct subordinate, Kyle Mitts—who Ward employed to assist with his investigation of fees—met with André Collin (at the time Lone Star's Global President and Grayken's "right-hand man") to discuss the fee issue on January 25, 2018, the first words that Collin told Mitts were "Hugh Ward is a whistleblower." Collin told

Mitts that they would deduct $12 million to $15 million from Ward's capital account for the costs and work that Ward had caused them to incur in trying to justify the new fees. Collin called Ward an "idiot" for raising the issue and putting it in emails. Collin also warned Mitts to "refrain from alerting the limited partners about the new fees."

103.    On or around January 25, 2018, Hudson CEO (and Grayken's brother in-law) Nick Beevers told members of Hudson's underwriting and asset-management teams, in so many words, that "Grayken owns both Lone Star and Hudson" so that Beevers "did not see what the big fee debate is about" and that "Grayken can do what he wants since he controls both entities."

104.    On another occasion around the same time, Lone Star's Senior Managing Director of Portfolio Management and Operations, Danick Tremblay, told Ward and Kyle Mitts that André Collin had instructed Hudson to charge, and Lone Star to pay Hudson, "…**double the prior year's fees and round up**." Tremblay further stated that Collin "**deemed the hit acceptable**," referring to the "hit" to investment returns.

105.    On February 3, 2018, Ward emailed Brian Collyer and copied his Co-Head of North America, Bob Ricci. The subject of the email was "New York Monday/Tuesday." The purpose of the email was to set up a meeting to "further discuss [Asset Management] fees" as "[e]very day brings more, new revelations, all bad[.]"

106.    On February 6, 2018, a meeting was held in New York to discuss the Hudson-Lone Star fee arrangement. Present at the meeting were Brian Collyer, Hugh Ward, Bob Ricci, Kyle Mitts, Larry Goland (then-Managing Director of North America), and other members of the Lone Star commercial real estate team. Also on the phone were members of the Lone Star Opportunity team. The Opportunity team members were

hearing about the fee issue for the first time. Ward led the discussion noting all the metrics by which the spike in fees was outrageous.

107.    The Opportunity funds have been and are subject to the same Hudson fee-scheme as Lone Star's commercial real estate funds. As set forth more fully below, Hudson's own internal documentation shows that the scheme applied equally to the commercial real estate funds and Opportunity funds, without limitation. In fact, Ward is informed and believes that the Opportunity funds gave asset management assignments to Hudson when more experienced and much more cost-effective third-party managers were available.

108.    On February 9, 2018, Ward sent a more detailed analysis and presentation of the fee-issue to Brian Collyer, copying Bob Ricci. That email and presentation are annexed hereto as **Exhibit 4**. The presentation describes and depicts graphically the exponential increase in fees from 2015 and projected forward through 2018. Among other things, the presentation shows that the variance from comparable rates charged by third parties ranged from **437%** on the low end to **4040%** on the high end. At the end of the presentation, Ward outlines "Next Steps" of how to achieve a "Complete Overhaul of how Hudson is Controlled."

109.    Remarkably, the staggering numbers depicted in **Exhibit 4** only included Lone Star's commercial real estate investments in North America and did not include the fees Hudson charged on the assets under Lone Star's management in the Opportunity funds, or Lone Star's commercial real estate investments in Latin America, Europe and Asia. This information was not available to Ward and his team at the time.

110.    On information and belief, if all of Lone Star's investments had been included in Ward's analysis, and if the timeframe of analysis were extended back to the

beginning of Lone Star's operations, Hudson's abuse of the Hudson-Lone Star fee-arrangement is likely to have begun at the very outset of that arrangement in 1995, and is likely to extend to every asset under Lone Star's management.

111.    Both the amount of excess fees charged and the negative effect on the investment returns were material amounts to United States' and the *Qui Tam* States' investments and the returns on those investments.

112.    Had the astronomical Hudson fees been included when Lone Star's investments were underwritten, none of the investments would have been consummated or approved by Lone Star's Investment Committee.

113.    As to the specific fee increases Ward was able to identify, Hudson's fees were so high that some of Lone Star's investments did not have enough free cash flow to pay them and managers had to borrow from lines of credit just to do so.

114.    Lone Star holds quarterly meetings of investors, including "Advisory Committees" comprised in part by representatives of major investors. Representatives of the *Qui Tam* States have been, and are now, on Lone Star's Advisory Committees for the funds in which they are limited partners.

115.    At the investor meetings, Lone Star representatives present results to the Advisory Committee representatives. The presentations revolve around the "big-picture" results and objectives of each particular fund, which ordinarily target a hefty rate of return of 25 percent. However, Lone Star has never disclosed the massive overcharges in fees paid to Hudson.

116.    On February 14, 2018, in response to Ward's demands for some explanation of Hudson's fees, Hudson Chief Operating Officer, Jodie Cason sent Ward an internal Hudson presentation regarding fees. Among other things, the presentation

contains several pages depicting "return sensitivity" for various Lone Star investment projects, and depicts what happens to Lone Star's returns if different fee-scenarios are selected. That internal Hudson presentation is annexed hereto as **Exhibit 5**.

117.    For the Lighthouse project, for example, the presentation contained in **Exhibit 5** outlines a "base case" of fees at 16 BPS, and then examines the changes to the return-rate that would occur if Hudson doubled, quadrupled, quintupled, all the way up to octupled (8X) the fees:

| Case | AM Fees (% of APP) | Multiple of Base Fees | Returns Summary | | Total Profit | | Projected AM Fees | | | | | Total Corp Services | Total Fees | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | IRR | CRM | $m | Δ vs. Base | Year 1 | Year 2 | Year 3 | Year 4 | Total AM | | AM + Corp | Δ vs. Base |
| Base Underwritten Scenario | 0.16% | N/A | 25.0% | 1.99x | $1,095.3 | N/A | $10.5 | 8.9 | 8.9 | 8.7 | 37.0 | 13.3 | 50.3 | N/A |
| Alternate Scenario 1 | 0.32% | 2.0x | 24.0% | 1.95x | 1,058.3 | (37.0) | 20.9 | 17.9 | 17.9 | 17.3 | 74.0 | 13.3 | 87.3 | 37.0 |
| Alternate Scenario 2 | 0.48% | 3.0x | 23.0% | 1.91x | 1,021.2 | (74.1) | 26.8 | 26.8 | 26.8 | 26.0 | 111.0 | 13.3 | 124.3 | 74.0 |
| Alternate Scenario 3 | 0.64% | 4.0x | 22.0% | 1.88x | 984.2 | (111.1) | 41.9 | 35.8 | 35.8 | 34.6 | 148.0 | 13.3 | 161.3 | 111.0 |
| Alternate Scenario 4 | 0.80% | 5.0x | 21.0% | 1.84x | 947.2 | (148.1) | 52.4 | 44.7 | 44.7 | 43.3 | 185.0 | 13.3 | 198.3 | 148.0 |
| Alternate Scenario 5 | 0.96% | 6.0x | 20.0% | 1.80x | 910.2 | (185.1) | 62.8 | 53.7 | 53.7 | 51.9 | 222.0 | 13.3 | 235.3 | 185.0 |
| Alternate Scenario 6 | 1.12% | 7.0x | 19.0% | 1.76x | 873.1 | (222.2) | 73.3 | 62.6 | 62.6 | 60.6 | 259.0 | 13.3 | 272.3 | 222.0 |
| Alternate Scenario 7 | 1.28% | 8.0x | 18.1% | 1.72x | 836.1 | (259.2) | 83.8 | 71.5 | 71.5 | 69.2 | 296.1 | 13.3 | 309.4 | 259.0 |
| Alternate Scenario (18% IRR) | 1.30% | 8.1x | 18.0% | 1.71x | $ 832.1 | $ (263.2) | $ 84.9 | $ 72.5 | $ 72.5 | $ 70.1 | $ 300.1 | $ 13.3 | $ 313.4 | $ 263.1 |

118.    The selection of 16 BPS as a "base case" was not coincidental; 16 BPS was the number approved by the Investment Committee when the Lighthouse acquisition was underwritten. A similar analysis was performed across the various Lone Star investments.

119.    The goal of Hudson's presentation was obvious: **see how far Hudson could push fees before investors would notice**.

120.    As set forth on page 3 of the presentation (**Exhibit 5** at 3), Hudson performs the same "return sensitivity" analysis on Lone Star's Opportunity funds, Lone Star's commercial real estate funds, and Lone Star's "residential mortgage" funds (denominated "LSRMF")—*i.e.*, **all** of Lone Star's then-existing funds, without limitation.

121.    On February 15, 2018, a teleconference was held between Hudson and Lone Star teams. Hudson Chief Operating Officer, Jodi Cason, arranged the call. The purpose was to discuss Ward's team's findings and the materials Ward's team had

received from Cason. Cason refused to "debate" whether fees are "market" and refused to offer any comparable fees to refute the comparables that Ward's team had submitted. She further said, in so many words, that if Ward's team did not come to see things her way, she would inform Ward's superiors that Ward's team would not "cooperate." Within an hour of the call ending, Cason followed-up with an email to Hudson's team-members, copying Ward's team, and instructing the Hudson team to no longer allocate resources to Lone Star's efforts to explain fees or to share anything further with Lone Star.

122.    On February 16, 2018, Ward sent yet another presentation to Brian Collyer regarding the fee issue. Ward's "Updated Analysis" demonstrated in even clearer terms the impact the fees were having on, among other things, the promised returns of Lone Star's investments. For each investment, the targeted "Internal Rate of Return" (IRR) was 25%. The fees alone would cause the actual returns to drop in a range from 240 BPS (10%) in the best case and 1620 BPS (65%), in the worst. As one example, Project Rebound was originally projected to return a 25% annual IRR with market-based fees; had Lone Star's "new fees" been billed from day one, the IRR would have decreased to 8.8%. Again, this analysis only included the North American commercial real estate investments. It did not include the impact of Hudson's fees on the rest of Lone Star's many other investments worldwide, including the Opportunity funds. Nor did it endeavor to trace back the historical impact fees had been having on Lone Star's actual returns since 1995. Annexed hereto as **Exhibit 6** is a copy of that email and presentation.

123.    On information and belief, the true impact of Hudson's fees on investor returns since 1995 is enormous. Annexed hereto as **Exhibit 7**, and incorporated by reference herein, is a chart showing all of the Lone Star funds impacted by the Hudson-Lone Star fee scheme. The list includes every Lone Star fund created since 1995.

124.    Prior to each investor conference, the asset managers for each of the North American funds would have a meeting to discuss results and issues. One such meeting was scheduled for February 22, 2018. As the Co-Head of North American Commercial Real Estate, Ward directed all of the North American asset managers in that division to produce a presentation showing how Hudson's fees were negatively impacting their returns. No such wide-scoped analysis had been done previously. The presentations that resulted from Ward's directive are annexed hereto as **Exhibit 8**.  Almost every asset manager included entries showing how higher Hudson fees were impacting their returns. On information and belief, the impact of Hudson's overcharge to Lone Star for North American commercial real estate investments was $38,000,000 in 2017 alone and $94,000,000 in 2018, significant and material amounts to those funds and each investor.

125.    The above investigation and response by Hudson and Relator's superiors reflects that the astronomical Hudson fee increases were both knowing and intentional by the senior leadership of Lone Star and Hudson.

### D. **Grayken has Ward and his immediate subordinate, Kyle Mitts, terminated from Lone Star for getting too close for comfort.**

126.    On February 23, 2018, a meeting was scheduled to conduct the annual business plan review of the Lighthouse investment. This was the most important internal meeting of the year, as Lighthouse was Lone Star's biggest investment project ever, involving over a billion dollars in committed capital and over eight billion dollars in assets under management. John Grayken himself convened the meeting. Grayken had convened and attended each prior meeting. Ward had planned to discuss the fee issue with Grayken during the call, as Grayken knew since he had received a presentation from Ward prior to the meeting. But, on this occasion, Grayken unexpectedly did not join the

call, and the meeting was cut short.

127.    On March 1, 2018, Ward received a calendar invitation from Brian Collyer to meet in Collyer's office. The invitation was titled "Lighthouse Follow-up." Ward presumed it was to discuss the Lighthouse project. Ward arrived at Collyer's office with his Lighthouse materials in-hand. As soon as Ward sat down, Collyer told Ward: "We are going to be letting you go. We determined that you are no longer part of the culture going forward." Ward then asked Collyer "what will happen with the fee debacle?" Collyer responded that "we will continue to look at it and work with senior leadership to address it." Collyer then told Ward that he was planning to have a similar conversation with Kyle Mitts momentarily to terminate him as well and asked Ward whether he would like to do it instead. Ward declined.

128.    Kyle Mitts was terminated minutes later.

129.    At the same meeting where Ward was terminated, Collyer offered Ward a consulting assignment on another investment project (code-named "Alloy") because Ward was the "face" of the investment project, which was a joint venture with another investment firm. As Collyer recognized, Ward was critical to the success of the investment. Ward also asked Collyer whether he could continue to consult on the Lighthouse project, since it was so large and Ward was in charge of it. Collyer told Ward he would need to get approval from his higher-ups. Although Ward originally accepted a consultancy role in order to remain involved in the investments, he ultimately declined the assignment.

130.    At the time he was terminated, Ward was the top performing manager in all of Lone Star.

131.    On March 2, 2018, Collyer circulated a companywide memorandum

titled "Organizational Announcement," stating that Ward "will shortly be leaving the firm." Among other things, it stated that "Bob Ricci will continue to head North America region's commercial real estate activities, and work with Hugh over the next few weeks to ensure a smooth transition of responsibilities." It confirmed that Ward would remain a consultant on Lighthouse and another project code-named "Alloy" (Ward ultimately declined the role). A copy of that memorandum is annexed hereto as **Exhibit 9**.

132.    Based on conversations Ward has had with Lone Star employees that remained with Lone Star after Ward's departure, both André Collin and Brian Collyer told them that Ward and Mitts were terminated because they would not "drop the fee issue" and because Grayken and his cohort "could no longer control" Ward and Mitts.

133.    At or around the same time Ward was fired on March 1, 2018, Ward's European counterpart, Olivier Brahin—the head of European investments—was also terminated. At or around the time he was terminated, Brahin was challenging Hudson's fees in connection with the European investments he oversaw.

134.    Again, the unexplained absence of Grayken from the yearly Lighthouse meeting in which the Relator intended to directly raise the issue of the astronomical and undisclosed Hudson fees coupled with the subsequent termination of the Relator and Mitts shortly thereafter further evinces that the Hudson-Lone Star scheme was both knowing and intentional by not just the senior leadership of Lone Star and Hudson, but by Grayken himself.

**E.  Lone Star conceals Hudson's fees from investors.**

135.    Ward was unable to present his findings to investors at the March 7, 2018 Joint Informational Advisory Committee Meeting regarding LSREF IV (U.S.) (which included the Lighthouse project), LSREF II (U.S.) and LSREF III (U.S.). On

information and belief, several representatives of the *Qui Tam* States attended those meetings as members of the Advisory Committees. No one heard a thing about Hudson's Fees and the enormous impact those fees were having on returns.

136.    Ward had delivered some of the presentations to Lone Star's investors in the prior investors' meetings on December 5, 2017. Several representatives of the *Qui Tam* States attended those meetings as members of the Advisory Committees. As reflected in the Minutes of the December 5, 2017 Advisory Committee meeting for LSREF IV (annexed hereto as **Exhibit 10**), Ward had explained the strategy and positive results of the Lighthouse investment, including a "17% cash on cash yield." At the same investor meeting, Ward had also explained the results of another investment project, internally code-named "Bravo," where the cash-on-cash yield was also 17 percent for the quarter-ending December 2017.

137.    By the time of the March 7, 2018 meeting, however, the cash-on-cash yield for Lighthouse had dropped to 15 percent and the cash-on-cash yield for Bravo had dropped to 13 percent—a 200 BPS and 400 BPS drop, respectively. The drop in cash-on-cash yield was entirely due to Hudson overcharging fees. Despite the precipitous drop in cash, Lone Star's investors, including Relator, the United States and the *Qui Tam* States, received no explanation as to the cause.

138.    Relator is an investor in LSREF II (U.S.), LSREF III (U.S.) and LSREF IV (U.S.) through certain "co-investment" vehicles designed for Lone Star and Hudson employees to invest in the Lone Star Funds. As an investor, Ward receives annual financial disclosures audited by Ernst & Young, an accounting firm ("EY"). On information and belief, the United States and the *Qui Tam* States receive similar financial disclosures annually. A copy of the financial disclosures for the "co-investment" vehicles

related to LSREF IV (U.S.) for the year ended December 31, 2017, is annexed hereto as **Exhibit 11**. A copy of the financial disclosures for the "co-investment" vehicles related to LSREF III (U.S.) for the year ended December 31, 2017, is annexed hereto as **Exhibit 12**. As stated on the first page of each set of disclosures, it was Lone Star (and not EY) that was responsible for the truthfulness and accuracy of its financial statements:

> [Lone Star] Management is responsible for the preparation and fair presentation of these financial statements in conformity with U.S. generally accepted accounting principles; this includes the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free of material misstatement, whether due to fraud or error.

139.   Nowhere in the financial disclosures is there any disclosure of the amount of fees charged by Hudson. Nowhere in the financial disclosures, or in any other publication or statement to Lone Star limited partners, was there any disclosure of the huge increase in Hudson's fees.

140.   And, as always, the "Related Party Transactions" section of the financial disclosures confirm that the terms of the arrangement with Hudson "must be commercially reasonable," though it omits confirmation of the requirements that dealings be "arms' length," and on terms comparable to those obtainable from third-parties, as required by the limited partnership agreements (and as more fully set forth above).

141.   Lone Star and Hudson presented their claims for payment of these fees to the funds and, ultimately, to the United States and the *Qui Tam* States. The funds received the false claim for payment in the form of the notices from Hudson to the various Lone Star funds described above by the Relator. In turn, the financial disclosures and other notices and communications to investors that reflected reduced returns due to

the secretly charged and astronomical Hudson fees without disclosing the Hudson-Lone Star scheme presented false claims for payment to the United States and the *Qui Tam* States.

142.    On information and belief, this was not the first time Grayken manipulated the Hudson-Lone Star fee arrangement for his own liquidity needs or desires. In all probability, Grayken has been using the Hudson-Lone Star fee arrangement to finance his own personal liquidity needs and desires since the inception of the relationship between Lone Star and Hudson's predecessor, Brazos Advisors, in 1995. He simply directs Hudson to overcharge Lone Star in the amount that suits his needs, and then directs Lone Star to pay.

143.    On information and belief, the amounts that Hudson has overcharged investors in the many Lone Star limited partnerships created since Lone Star's inception will prove shocking. Even conservative estimates put the overcharge well over a billion dollars. Assuming, for purposes of conservative illustration, that Hudson applied a one percent (1.0%) overcharge on $30,000,000,000.00 in assets under Lone Star's management for a period of five years, the overcharge would yield $1,500,000,000.00 (one billion and five-hundred million dollars) in liquidity. That liquidity would be distributed directly to Grayken via Hudson (likely with some handsome payoffs to the members of Grayken's trusted inner circle).

144.    Relator estimates that the United States and the *Qui Tam* States have been overcharged for asset-management services a minimum of **$60,000,000**, and

that only includes the investments for which Relator has records.[2] Both this amount of excess fees charged and the negative effect on the investment returns were material amounts to the United States and *Qui Tam* States.

145.    No disclosures of the scheme had been made to the United States and the *Qui Tam* States prior to Ward leaving Lone Star in 2018. As set forth above, Ward has seen nothing in the financials since he has left Lone Star that disclosed the scheme or increased Hudson fees. Upon information and belief, none of the United States or the *Qui Tam* States have ever received any disclosures about the Hudson-Lone Star scheme. The United States and the *Qui Tam* States have never approved the payment of any of the fund fees or the returns on its investments with any knowledge of the Hudson-Lone Star scheme.

### F.   **Ward assists other jurisdictions to investigate the Hudson-Lone Star Scheme.**

146.    Beginning several months following his termination, and for the past two years, Ward has been assisting other jurisdictions in their investigation of the Hudson-Lone Star scheme.

147.    Ward is the original source of this information in this matter and for other jurisdictions investigating the Hudson-Lone Star scheme. The information is not based upon publicly-disclosed information.

148.    No further allegations regarding ongoing investigations in other jurisdictions will be made in this complaint to avoid compromising those investigations,

---

[2] Applying the same rate of overcharging across all of the Lone Star funds in which United States and the *Qui Tam* States have invested and a longer timeframe, the fraudulent fees assessed might extend into the hundreds of millions or more.

except to allege that Defendants are already on notice of those investigations.

149.    Except as alleged herein, the facts concerning Defendants' violations of the False Claims Act are exclusively within their custody and control, and not available to Relator. At all relevant times, Defendants concealed, and continue to conceal, Hudson's overcharging of fees to Lone Star.

## COUNT I
### Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

150.    The allegations contained above are incorporated herein by reference.

151.    The National Railroad Retirement Investment Trust is a limited partner in one or more Lone Star limited partnership. The United States government administers the National Railroad Retirement Investment Trust through the Railroad Retirement Board.

152.    Through the acts described above, Defendants, including their agents, employees and co-conspirators, knowingly presented and caused to be presented false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment and approval from the United States and, in particular, from the Railroad Retirement Board or its agents.

153.    The United States was unaware of the falsity of the claims made and submitted by the Defendants, their agents, employees and co-conspirators, and as a result paid money that they otherwise would not have paid.

154.    By reason of the payments made by the United States as a result of the

Defendants' fraud, the United States has been, and may continue to be, severely damaged.

## COUNT II
## Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

155.    The allegations contained above are incorporated herein by reference.

156.    The National Railroad Retirement Investment Trust is a limited partner in one or more Lone Star limited partnership. The United States government administers the National Railroad Retirement Investment Trust through the Railroad Retirement Board.

157.    Through the acts described above, the Defendants, including their agents, employees and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, in order to induce the United States and, in particular, the Railroad Retirement Board or its agents. to approve and pay false and fraudulent claims.

158.    The United States was unaware of the falsity of the records, statements, and claims made and submitted by the Defendants, their agents, employees and co-conspirators, and as a result paid money that they otherwise would not have paid.

159.    By reason of the payments made by the United States as a result of the Defendants' fraud, the United States has been, and may continue to be, severely damaged.

## COUNT III
## Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

160.    The allegations contained above are incorporated herein by reference.

161.    The National Railroad Retirement Investment Trust is a limited partner in one or more Lone Star limited partnership. The United States government administers the National Railroad Retirement Investment Trust through the Railroad Retirement

Board.

162.    As detailed above, Defendants conspired to present, or to cause to be presented, a false or fraudulent claim for payment or approval to the United States, and conspired to fail to disclose material facts, in order to obtain payment and approval from the United States and, in particular, the Railroad Retirement Board or its agents, in violation of 31 U.S.C. § 3729(a)(1)(C).

163.    In further violation of 31 U.S.C. § 3729(a)(1)(C), Defendants conspired to make, use, or to cause to be made or used, a false record or statement material to a false or fraudulent claim.

164.    In further violation of 31 U.S.C. § 3729(a)(1)(C), Defendants conspired to make, use, or to cause to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, and/or conspired to conceal or improperly avoid or decrease an obligation to pay or transmit money or property to the United States or its agencies or political subdivisions

165.    Defendants committed overt acts in furtherance of the conspiracy as described above.

166.    By reason of the payments made by the United States as a result of the Defendants' conspiracy, the United States has been, and may continue to be, severely damaged.

## **COUNT IV**
## **Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**

167.    The allegations contained above are incorporated herein by reference.

168.    The National Railroad Retirement Investment Trust is a limited partner in one or more Lone Star limited partnership. The United States government administers

the National Railroad Retirement Investment Trust through the Railroad Retirement Board.

169.     As detailed above, Defendants knowingly made, used, and/or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States and, in particular, the Railroad Retirement Board or its agents, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States or its agencies or political subdivisions.

170.     As a result of Defendants' actions as set forth above, the United States has been, and may continue to be, severely damaged.

<u>**COUNT V**</u>
**Violation of Hawaii False Claims Act**

171.     The allegations contained above are incorporated herein by reference.

172.     This is a civil action brought by Relator, on behalf of the State of Hawaii, against Defendants under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-25.

173.     Defendants knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its agencies or political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(1).

174.     Defendants knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, its agencies or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

175.     Defendants knowingly made, used, and/or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property

to the State of Hawaii, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States or its agencies or political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(6).

176.    As detailed above, Defendants conspired to commit violations of subdivisions (a)(1), (a)(2) and (a)(6) of Haw. Rev. Stat. §§ 661-21, in violation of Haw. Rev. Stat. § 661-21(a)(8).

177.    The State of Hawaii, or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements or records made by Defendants, and in reliance upon the accuracy of these claims and/or statements, have been, and may continue to be, severely damaged.

<u>COUNT VI</u>
**Violation of Indiana False Claims and Whistleblower Protection Act**

178.    The allegations contained above are incorporated herein by reference.

179.    This is a civil action brought by Relator, on behalf of the State of Indiana, against Defendants under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

180.    Defendants knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Indiana, or its agencies or political subdivisions, false or fraudulent claims for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(1).

181.    Defendants knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Indiana, its agencies or its

political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

182.     Defendants knowingly made, used, and/or caused to be made or used, false records or statements to avoid an obligation to pay or transmit money or property to the State of Indiana, or its agencies or political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

183.     As detailed above, Defendants conspired to commit violations of subdivisions (b)(1), (b)(2) and (b)(6) of Ind. Code § 5-11-5.5-2, in violation of Ind. Code § 5-11-5.5-2(b)(7).

184.     As detailed above, Defendants, and each of them, caused or induced another person to perform the acts described in subdivisions (b)(1), (b)(2) and (b)(6) of Ind. Code § 5-11-5.5-2, in violation of Ind. Code § 5-11-5.5-2(b)(8).

185.     The State of Indiana, or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements or records made by Defendants, and in reliance upon the accuracy of these claims and/or statements, have been, and may continue to be, severely damaged.

## COUNT VII
### Violation of Maryland False Claims Act

186.     The allegations contained above are incorporated herein by reference.

187.     This is a civil action brought by Relator, on behalf of the State of Maryland, against Defendants under the Maryland False Claims Act, Md. Gen. Provis. § 8-102.

188.     Defendants knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Maryland false or fraudulent claims for payment or approval, in violation of Md. Gen.

Provis. § 8-102(b)(1).

189.    Defendants knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Maryland, in violation of Md. Gen. Provis. § 8-102(b)(2).

190.    Defendants knowingly made, used, and/or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State of Maryland, in violation of Md. Gen. Provis. § 8-102(b)(7).

191.    Defendants knowingly concealed, or knowingly and improperly avoided or decreased, an obligation to pay or to transmit money or other property to the State of Maryland, in violation of Md. Gen. Provis. § 8-102(b)(8).

192.    Defendants knowingly made other false or fraudulent claims against the State of Maryland, in violation of Md. Gen. Provis. § 8-102(b)(9).

193.    As detailed above, Defendants conspired to commit violations of subdivisions (b)(1), (b)(2), (b)(7), (b)(8) and (b)(9) of Md. Gen. Provis. § 8-102, in violation of Md. Gen. Provis. § 8-102(b)(3).

194.    The State of Maryland was unaware of the falsity of the claims and/or statements or records made by Defendants, and in reliance upon the accuracy of these claims and/or statements, have been, and may continue to be, severely damaged.

## COUNT VIII
## Violation of New Jersey False Claims Act

195.    The allegations contained above are incorporated herein by reference.

196.    This is a civil action brought by Relator, on behalf of the State of New Jersey, against Defendants pursuant to the New Jersey False Claims Act, N.J. Stat. Ann.

§ 2A:32C-5(b).

197.     Defendants knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to a contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval, in violation of  N.J. Stat. Ann. § 2A:32C-3(a).

198.     Defendants knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

199.     Defendants knowingly made, used, and/or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New Jersey, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

200.     As detailed above, Defendants conspired to defraud the State of New Jersey by getting a false or fraudulent claim allowed or paid by the State of New Jersey, in violation of N.J. Stat. Ann. § 2A:32C-3(c).

201.     The State of New Jersey was unaware of the falsity of the claims and/or statements or records made by Defendants, and in reliance upon the accuracy of these claims and/or statements, have been, and may continue to be, severely damaged.

### COUNT IX
### Violation of New Mexico Fraud Against Taxpayers Act

202.     The allegations contained above are incorporated herein by reference.

203.     This is a civil action brought by Relator, on behalf of the State of New Mexico, against Defendants pursuant to the New Mexico Fraud Against Taxpayers Act,

N.M. Stat. Ann. § 44-9-5.

204.    Defendants knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to a contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval, in violation of  N.M. Stat. Ann. § 44-9-3(A)(1).

205.    Defendants knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false, misleading or fraudulent records or statements to obtain or support the approval of or the payment on a false or fraudulent claim, in violation of N.M. Stat. Ann. § 44-9-3(A)(2).

206.    Defendants made or used, or caused to be made or used, false, misleading or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money or property to the State of New Mexico, in violation of N.M. Stat. Ann. § 44-9-3(A)(8).

207.    As detailed above, Defendants conspired to defraud the State of New Mexico by obtaining approval or payment on false or fraudulent claims, in violation of N.M. Stat. Ann. § 44-9-3(A)(3).

208.    As detailed above, Defendants conspired to make, use or cause to be made or used, false, misleading or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money or property to the State of New Mexico, in violation of N.M. Stat. Ann. § 44-9-3(A)(4).

209.    The State of New Mexico was unaware of the falsity of the claims and/or statements or records made by Defendants, and in reliance upon the accuracy of these

claims and/or statements, have been, and may continue to be, severely damaged.

## COUNT X
### Violation of the North Carolina False Claims Act

210.      The allegations contained above are incorporated herein by reference.

211.      This is a civil action brought by Relator, on behalf of the State of North Carolina, against Defendants pursuant to the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

212.      Defendants knowingly presented or caused to be presented, and may still be presenting or causing to be presented a false or fraudulent claim for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

213.      Defendants knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements material to a false or fraudulent claim, in violation of N.C. Gen. Stat. § 1-607(a)(2).

214.      Defendants had possession, custody, or control of property or money used or to be used by the State of North Carolina and knowingly delivered or caused to be delivered less than all of that money or property, in violation of N.C. Gen. Stat. § 1-607(a)(4).

215.      Defendants made or used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided, or decreased an obligation to pay or transmit money or property to the State of North Carolina, in violation of N.C. Gen. Stat. § 1-607(a)(7).

216.      As detailed above, Defendants conspired to commit violations of subdivisions (1), (2), (4), and (7) of N.C. Gen. Stat. § 1-607(a), in violation of N.C. Gen.

Stat. § 1-607(a)(3).

217.    The State of North Carolina was unaware of the falsity of the claims and/or statements or records made by Defendants, and in reliance upon the accuracy of these claims and/or statements, has been, and may continue to be, severely damaged.

<u>COUNT XI</u>
**Violation of Rhode Island False Claims Act**

218.    The allegations contained above are incorporated herein by reference.

219.    This is a civil action brought by Relator, on behalf of the State of Rhode Island, against Defendants pursuant to the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

220.    Defendants knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

221.    Defendants knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements material to a false or fraudulent claim, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

222.    Defendants had possession, custody, or control of property or money used or to be used by the State of Rhode Island and knowingly delivered or caused to be delivered less than all of that money or property, in violation of R.I. Gen. Laws § 9-1.1-3(a)(4).

223.    Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the State of Rhode Island, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Rhode

Island, in violation of R.I. Gen. Laws § 9-1.1-3(a)(4).

224.    As detailed above, Defendants conspired to commit violations of subdivisions (a)(1), (a)(2), (a)(4), and (a)(7) of R.I. Gen. Laws § 9-1.1-3, in violation of R.I. Gen. Laws § 9-1.1-3(a)(3).

225.    The State of Rhode Island was unaware of the falsity of the claims and/or statements or records made by Defendants, and in reliance upon the accuracy of these claims and/or statements, has been, and may continue to be, severely damaged.

<u>**COUNT XII**</u>
**Violation of Vermont False Claims Act**

226.    The allegations contained above are incorporated herein by reference.

227.    This is a civil action brought by Relator, on behalf of the State of Vermont, against Defendants pursuant to the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 632.

228.    Defendants knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(1).

229.    Defendants knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements material to a false or fraudulent claim, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(2).

230.    Defendants entered into written agreements or contracts with an official of the State of Vermont or its agent knowing the information contained therein was false, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(8).

231.    Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to

the State of Vermont, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(9).

232.    Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of Vermont, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(10).

233.    As detailed above, Defendants conspired to commit violations of subdivisions (a)(1), (a)(2), (a)(8), (a)(9) and (a)(10) of Vt. Stat. Ann. tit. 32, § 631, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(12).

234.    The State of Vermont was unaware of the falsity of the claims and/or statements or records made by Defendants, and in reliance upon the accuracy of these claims and/or statements, has been, and may continue to be, severely damaged.

## <u>COUNT XIII</u>
### Violation of Virginia Fraud Against Taxpayers Act

235.    The allegations contained above are incorporated herein by reference.

236.    This is a civil action brought by Relator, on behalf of the Commonwealth of Virginia, against Defendants pursuant to the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5.

237.    Defendants knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

238.    Defendants knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements material to a false or fraudulent claim, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

239.    Defendants had possession, custody, or control of property or money used, or to be used, by the Commonwealth and knowingly delivered, or caused to be

delivered, less than all such money or property, in violation of Va. Code Ann. § 8.01-216.3(A)(4).

240.    Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Commonwealth, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or to transmit money or property to the Commonwealth, in violation of Va. Code Ann. § 8.01-216.3(A)(8).

241.    As detailed above, Defendants conspired to commit violations of subdivisions (A)(1), (A)(2), (A)(4), and (A)(8) of Va. Code Ann. § 8.01-216.3, in violation of Va. Code Ann. § 8.01-216.3(A)(3).

242.    The Commonwealth of Virginia was unaware of the falsity of the claims and/or statements or records made by Defendants, and in reliance upon the accuracy of these claims and/or statements, has been, and may continue to be, severely damaged.

**WHEREFORE**, Relator prays for judgment against Defendants as follows:

A.    That Defendants be ordered to cease and desist from submitting or causing to be submitted any more false claims, or further violating: 31 U.S.C. § 3279 *et seq*., Haw. Rev. Stat. § 661-21 *et seq*.; Ind. Code § 5-11-5.5 *et seq*.; Md. Gen. Provis. § 8-101 *et seq*.; N.J. Stat. Ann. § 2A:32C-1 *et seq*.; N.M. Stat. Ann. § 44-9-1, *et seq*.; N.C. Gen. Stat. § 1-605 *et seq*.; R.I. Gen. Laws § 9-1.1-1 *et seq*.; Vt. Stat. Ann. tit. 32, § 630 *et seq*.; and Va. Code Ann. § 8.01-216.1 *et seq*.

B.    That judgment be entered in Realtor's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3279(a), plus a civil penalty of not less than five thousand ($5,000) or more than ten

thousand dollars ($10,000) per claim as provided by 31 U.S.C. § 3279(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3739(d)., Haw. Rev. Stat. § 661-27.; Ind. Code § 5-11-5.5-6; Md. Gen. Provis. § 8-105; N.J. Stat. Ann. § 2A:32C-7; N.M. Stat. Ann. § 44-9-7; N.C. Gen. Stat. § 1-610; R.I. Gen. Laws § 9-1.1-4; Va. Code Ann. § 8.01-216.7; and Vt. Stat. Ann. tit. 32, § 635;

D.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than five thousand ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

E.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of not less than five thousand ($5,000) per claim as provided by Ind. Code § 5-11-5.5-2(b), to the extent such multiplied penalties shall fairly compensate the State of Indiana for losses resulting from the scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Maryland, multiplied as provided for in

Md. Gen. Provis. § 8-102, plus a civil penalty of not less than five thousand ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by Md. Gen. Provis. § 8-102, to the extent such multiplied penalties shall fairly compensate the State of Maryland for losses resulting from the scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      G.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of New Jersey, multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act (31 U.S.C.s.3729 et seq.) for each false or fraudulent claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey for losses resulting from the scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      H.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of New Mexico, multiplied as provided for in N.M. Stat. Ann. § 44-9-3, plus a civil penalty of not less than five thousand ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by N.M. Stat. Ann. § 44-9-3, to the extent such multiplied penalties shall fairly compensate the State of New Mexico for losses resulting from the scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      I.     That judgment be entered in Relator's favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607, plus a civil penalty of not less than five thousand ($5,500) or more than eleven thousand dollars ($11,000) per

claim as provided for by N.C. Gen. Stat. § 1-607, to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Rhode Island multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than five thousand ($5,000) or more than eleven thousand dollars ($10,000) per claim as provided for by R.I. Gen. Laws § 9-1.1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island for losses resulting from the scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K.      That judgment be entered in Relator's favor and against Defendants for restitution to the State of Vermont for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Vt. Stat. Ann. tit. 32, § 631, multiplied as provided for in Vt. Stat. Ann. tit. 32, § 631, plus a civil penalty of not less than five thousand ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided for by Vt. Stat. Ann. tit. 32, § 631, to the extent such multiplied penalties shall fairly compensate the State of Vermont for losses resulting from the scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery

L.      That judgment be entered in Relator's favor and against Defendants for restitution to the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided for by Va. Code

Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the scheme undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

N.     That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

O.     That Relator be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: November 20, 2020

Respectfully submitted,

*/s/Samuel B Hardy, IV*
Samuel B. Hardy, IV
(Texas Bar No. 24074360)
shardy@lynnllp.com
Edward Jason Dennis
(Texas Bar No. 24045776)
jdennis@lynnllp.com
Eliyahu Ness
(Texas Bar No. 24119651)
eness@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800

**ATTORNEYS FOR RELATOR HUGH WARD**